**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDALL ROYER *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 22-1429 |
| | : | |
| DISCOVER FINANCIAL SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

**SCHMEHL, J. /s/ <u>JLS</u>**                                                    **November 7, 2023**

Plaintiffs Randall Royer, Nour Goda, and Ramon Royer initiated this action based, in large part, on an allegedly deficient investigation by Defendant Discover Financial Services, Inc. ("Discover") into a charge for construction services that Plaintiffs claim were never delivered. Presently before the Court is Discover's Motion to Dismiss (ECF No. 18), Plaintiffs' Motion for Temporary Restraining Order (ECF No. 12), and Plaintiffs' Motion for Sanctions (ECF No. 14). For the following reasons, the Court grants in part and denies in part Discover's Motion, denies Plaintiffs' Motion for Temporary Restraining Order, and denies without prejudice Plaintiffs' Motion for Sanctions.

**I.   BACKGROUND**

Plaintiffs Randall Royer and Nour Goda sought to renovate their basement to accommodate Mr. Royer's father, Plaintiff Ramon Royer, by eliminating his need to climb stairs in their home. (Second Am. Compl. ¶¶ 10, 12, ECF No. 11.)  In April 2021, Plaintiffs made a $9,000 down payment with a contractor, Daley's Construction Services, using a credit card issued by Defendant

Discover Financial Services, Inc. ("Discover").  (*Id.* ¶ 12.)  This charge first appeared on Plaintiffs' credit card statement on April 17, 2021.  (*Id.* ¶ 13.)

Daley's was to complete its work no later than Fall 2021.  (*Id.* ¶ 12.)  But in September 2021, after calling the contractor and, later, speaking with a Lehigh County detective, Plaintiffs concluded that the contractor had defrauded them.  (*Id.* ¶ 16.)  In fact, the owner of Daley's has apparently been arrested and faces charges in Lehigh County court, including for conduct relating to Plaintiffs' renovation.  (*Id.* ¶¶ 16, 34.)  Plaintiffs then allegedly notified Discover—through a website listed on the relevant cardmember agreement—that the $9,000 charge was fraudulent.  (*Id.* ¶ 19.)  The first credit card statement issued following Plaintiffs' notice reached Plaintiffs on October 18, 2021.  (*Id.* ¶ 20.)  Discover concluded its investigation and sent Plaintiffs a letter on November 10, 2021, which explained that Discover found the charge to be valid after obtaining a receipt from Daley's for the $9,000 down payment.  (*Id.* ¶ 21.)  Based on Plaintiffs' subsequent interaction with several of Discover's representatives, Plaintiffs claim that Discover failed to investigate whether Daley's had actually rendered the promised services.  (*Id.* ¶¶ 22–24.)

To preserve their claims for this action, Plaintiffs asked Discover to exclude the disputed charge from the calculation of their monthly minimum payments.  (*Id.* ¶ 30.)  After Discover allegedly refused, Plaintiffs stopped making payments on their account altogether, leading Discover to cancel the card and report Plaintiffs' nonpayment to credit agencies.  (*Id.* ¶¶ 30–32.)  Plaintiffs claim that this action harmed their credit scores and caused another lender to cancel the credit card it issued to Plaintiffs.  (*Id.* ¶ 33.)  They also claim that these adverse effects to their credit, together with Plaintiffs' present inability to recoup the $9,000 down payment at issue in this case, prevent Plaintiffs from hiring another contractor.  (*Id.* ¶ 28.)  Accordingly, Plaintiffs initiated this lawsuit, in which they seek relief under the Fair Credit Billing Act ("FCBA";

Count I), the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"; Count II), and negligence (Count III).

On the same day that Plaintiffs filed their Second Amended Complaint, they also requested an order from this Court "requiring the Defendant to charge back the disputed amount in this case and report to any credit reporting agencies that derogatory information concerning the disputed account should be deleted." (Pls.' TRO Mot. at 1, ECF No. 12.)   The urgency of these renovations is demonstrated, they argue, by a subsequent fall and injury sustained by Plaintiff Ramon Royer. (*Id.* at 3; *see also* Second Am. Compl. ¶ 29.)   Not long thereafter, they also filed a motion for sanctions concerning the availability of their online communications with Discover.   Discover subsequently moved to dismiss the Second Amended Complaint.

## II.   JURISDICTION

The Court has jurisdiction over the claims in this matter pursuant to 28 U.S.C. § 1331, as Plaintiffs bring suit under a federal law, the FCBA.   The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.   Venue is proper under 28 U.S.C. § 1391(b)(2) because Plaintiffs' home, where the renovations were to be performed, is within this District, making this District one in which a substantial part of the events or omissions giving rise to the claims occurred.

## III.   ANALYSIS

### A.   Discover's Motion to Dismiss

A plaintiff's "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).   To meet this standard, a complaint must plead "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 787.   The Third Circuit has developed a three-part framework in this analysis:   (1) a plaintiff must present enough facts to raise a reasonable

expectation that discovery will reveal evidence of the necessary elements; (2) a plaintiff's claims may not be merely conclusory; and (3) where there are well-pleaded factual allegations, the court should assume their truth and then determine if they plausibly entitle a plaintiff to relief. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787–89 (3d Cir. 2016). In this analysis, the Court must assume all nonconclusory factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and draw all reasonable inferences therefrom. *Id.* at 790.

Our analysis, however, changes somewhat when a party represents itself *pro se*. The Supreme Court requires us to "liberally construe" a *pro se* document. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Our Court of Appeals further instructs us to permit a curative amendment if a complaint is vulnerable to dismissal for failure to state a claim, unless amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Notwithstanding this leniency, however, a *pro se* plaintiff's complaint "must still meet Twombly and Iqbal's plausibility standard." *Itiowe v. Trentonian*, 620 F. App'x 65, 68 (3d Cir. 2015).

### 1.     Plaintiffs Have Pleaded a Claim Under the FCBA

### i.     Time May Be Excluded from the FCBA's 60-Day Deadline

The Truth in Lending Act, to which Congress later added the provisions of the FCBA, "is a remedial statute and should be construed liberally in favor of the consumer." *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 502 (3d Cir. 1998) (citing *Johnson v. McCrackin-Sturman Ford, Inc.*, 527 F.2d 257, 262 (3d Cir. 1975)). The FCBA, in turn, imposes certain obligations on a creditor, such as Discover, if that creditor, "within sixty days after having transmitted to an obligor

a statement of the obligor's account . . . , receives at the [statutorily appropriate] address . . . a written notice . . . from the obligor in which the obligor . . . sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor, . . . indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and . . . sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error."  15 U.S.C. § 1666(a).  Once a creditor has received that written notice, the creditor must, "not later than thirty days after the receipt of the notice, send a written acknowledgment thereof to the obligor," and "not later than two complete billing cycles of the creditor (in no event later than ninety days) after the receipt of the notice and prior to taking any action to collect the amount, . . . make appropriate corrections in the account of the obligor" or "send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement . . . ."  *Id.*

This case presents the question, largely unaddressed by existing case law, of the recourse available to an obligor who lacks reason to believe that a charge is fraudulent until more than sixty days after the obligor received the initial credit card statement reflecting the charge.  On the one hand, pursuant to the foregoing language of the FCBA, the sixty-day clock begins to tick upon transmission of the erroneous statement, without regard (in Discover's view) to the obligor's discovery of reasons to believe that a charge was made in error.  15 U.S.C. § 1666(a); *see also* 12 C.F.R. § 1026.13(b)(1) (defining "billing error notice" to be "written notice from a consumer that . . . [i]s received by a creditor . . . no later than 60 days after the creditor transmitted the first periodic statement that reflects the alleged billing error").  On the other hand, that same FCBA provision requires a complaining obligor to include in his or her written notice "the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error"—reasons that,

according to Plaintiffs' Second Amended Complaint, were not known to Plaintiffs until far more than 60 days after Discover had transmitted to them the relevant statement.  15 U.S.C. § 1666(a); *see also* 12 C.F.R. § 1026.13(b)(3) (requiring a "billing error notice" to include "the consumer's belief and the reasons for the belief that a billing error exists . . .").

In *Krieger v. Bank of Am., N.A.*, the Third Circuit addressed the point at which the sixty-day clock began ticking where an initial statement reflected a fraudulent transaction, the creditor reimbursed the obligor for that transaction after receiving a call from the obligor, and the creditor subsequently re-billed the obligor for the fraudulent amount after concluding its investigation.  890 F.3d 429, 434–35 (3d Cir. 2018).  Citing, among other things, "the remedial policies underlying . . . the FCBA" and its aim to "protect the consumer against . . . unfair credit billing and credit card practices," *id.* at 433, 438–39 (quoting 15 U.S.C. § 1601(a)), the Third Circuit held that the 60-day clock began ticking after the issuance of the second statement, not the first, *id.* at 439.  The Third Circuit reasoned that because "[t]he FCBA requires that a consumer dispute a billing error only where he 'belie[ves] that [his] statement contains a billing error,'" *id.* at 438 (quoting 15 U.S.C. § 1666(a)(2)), it "makes perfect sense" that "where the statement does not contain any errors, the FCBA does not impose any obligation on the consumer at all," *id.*  That said, the Third Circuit cautioned against "effectively read[ing] the 60-day requirement out of the statute," as would be the case "where the 60-day period restarted every month just because the charge went unpaid . . . ." *Id.* at 440.  Unfortunately for our purposes here, however, the Third Circuit ultimately declined to address the "argument that the 60-day period should be subject to equitable tolling."  *Id.* at 441 n.9.

The parties and the Court have found little case law pertinent to whether time may be excluded from the counting of the 60-day limit.[1]  In *RLFShop, LLC v. Am. Express Co.*, the plaintiffs framed their purported compliance with the 60-day deadline by alleging that they "notified AMEX [*i.e.*, the creditor-defendant] of the disputed charges within 60 days of the discovery that the charges reported on the credit card statement were fraudulent."  2019 WL 499835, at *5 (S.D. Ohio Feb. 8, 2019).  The Ohio court noted that "Plaintiffs' choice of words is important," as "[t]hey do not claim to have notified AMEX of the disputed charges within 60 days of AMEX's transmission of the billing statement that contained them," but rather "allege to have notified AMEX within 60 days of their *discovery* of the disputed charges."  *Id.*  The Court then held that "[w]hen Plaintiffs discovered the disputed charges might be relevant to an argument regarding the statute of limitations . . . but it is not relevant to whether Plaintiffs complied with the 60-day reporting requirement under the FCBA."  *Id.*

Another court has interpreted the 60-day limit less rigidly.  The plaintiff, who had co-signed on his son's account, did not receive the first statement containing an alleged billing error because the creditor sent it only to the son's address, and "[c]onsequently, plaintiff would have no reason to know that his name appeared on [the creditor's] statements."  *Belmont v. Assocs. Nat. Bank (Delaware)*, 119 F. Supp. 2d 149, 153–54, 161 (E.D.N.Y. 2000).  Nor did the court find that the plaintiff otherwise "ha[d] constructive notice" of the billing error.  *Id.*  Accordingly, the court

---

[1]     "Equitable tolling" or the "discovery rule" may be inapt terms for the relief sought here, as they suggest that the 60-day deadline is a statute of limitations, which it is not.  *See* 15 U.S.C. § 1640(e) (providing the applicable one-year statute of limitations).  Although Plaintiffs effectively seek the application of equitable tolling or the discovery rule, they argue that such exclusion of time is found within the terms of the FCBA itself, not by incorporation of statute-of-limitations principles.

calculated the 60-day limit from the date of the first statement sent to the plaintiff—*i.e.*, the date on which he had reason to know of the alleged billing error.  *Id.*

This Court finds that the analysis in *Belmont* more faithfully adheres to the mandate that the FCBA "is a remedial statute and should be construed liberally in favor of the consumer." *Ramadan*, 156 F.3d at 502.   As illustrated here, the FCBA is ambiguous concerning the responsibilities imposed on obligors whose goods or services turn out to be undelivered more than 60 days after their creditor issues them the relevant statement.  Under Discover's reading, such obligors must file *preemptive* written notices that their goods or services *might* not be delivered as promised.  These notices necessarily could not contain anything but purely speculative reasons for the obligors' belief, in contradiction of the FCBA.  *See* 15 U.S.C. § 1666(a) (requiring obligors to "indicate[] [their] belief that the statement contains a billing error and . . . set[] forth the reasons for [their] belief").  Likewise, how should a creditor comply with its obligation to investigate such unfounded beliefs?  *See Kreiger*, 890 F.3d at 438 ("[W]here the statement does not contain any errors, the FCBA does not impose any obligation on the consumer at all.  And that makes perfect sense. The consumer's goal in filing a written notice of billing error is to require the creditor either to correct the error or to conduct a reasonable investigation of the claim.  Where there is no error, notice would be nonsensical." (citation omitted)).   The Court will not adopt a reading that introduces patent absurdities into the statutory scheme.  Nor is the alternative outcome—that this subset of obligors is simply excluded from relief—consistent with the purposes of a "remedial" statute meant to "protect the consumer against . . . unfair credit billing and credit card practices." *Kreiger*, 890 F.3d at 433, 438–39 (quoting 15 U.S.C. § 1601(a)); *see also Ramadan*, 156 F.3d at 502.

In stark contrast, Plaintiffs' reading resolves the FCBA's potential internal tensions while comporting with its purpose.   A statement from a creditor reflecting a charge for services does not

contain a cognizable "billing error" until it becomes apparent that the services will not be delivered. Accordingly, the sixty-day clock does not begin ticking until the obligor becomes aware of the non-delivery. How else could that obligor send a written notice that sets forth the reasons for his or her belief that the services were not delivered, such that a creditor can then investigate that complaint?

Discover argues that contrary to *Krieger*, this position "effectively read[s] the 60-day requirement out of the statute," *id.* at 440, and creates an exception to that requirement foreclosed by the *Krieger* court. Not so. First, the Third Circuit rejected a rule "where the 60-day period restarted every month just because the charge went unpaid," *id.*, presumably because creditors typically send statements monthly, and therefore the sixty-day limit would never come to pass. This Court's holding here does not grant Plaintiffs the ability to reset the 60-day limit in perpetuity; a non-delivery of goods or services will become apparent no later than the date on which they are due. Instead, the Court rejects a similarly absurd rule that the 60-day clock begins ticking *at a time when no billing error exists*. Once Plaintiffs were aware that the purchased services would never be delivered, the 60-day clock began running, and nothing about the holding here permits an obligor to perpetually prevent that trigger from being pulled. Second, the *Krieger* court did not purport to create the *only* possible exception to the 60-day limit, and it indeed left open the possibility of other exceptions by expressly declining to reach the present issue. *Id.* at 441 n.9.

### ii.      Plaintiffs Have Alleged a "Billing Error"

A "billing error" includes "[a] reflection on a statement of goods or services . . . not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction." 15 U.S.C. § 1666(b)(3); *see also* 12 C.F.R. § 1026.13(a)(3) (providing a substantially similar definition). Official interpretation of this provision, however, clarifies that "[s]ection 1026.13(a)(3) does not apply to a dispute relating to the quality of property or services that the

consumer accepts." *Id.* (Supp. I, cmt. for 1026.13).  In contrast, undelivered services covered by the FCBA include "[d]elivery of . . . services different from that agreed upon[,] . . . [d]elivery of the wrong quantity," and "[l]ate delivery."  *Id.*

Discover argues that Plaintiffs' issues with Daley's amount to complaints about the quality of the services received.  If so, that would bar Plaintiffs' recovery under the FCBA, as numerous courts have held.  *See, e.g.*, *Beaumont v. Citibank (S. Dakota) N.A.*, 2002 WL 483431, at *3–5 (S.D.N.Y. Mar. 28, 2002) (the plaintiff, who allegedly received products that were not in working condition, could bring only an FCBA claim if his creditor failed to credit the initial charge or re-billed him in the future); *Greisz v. Household Bank (Illinois)*, 8 F. Supp. 2d 1031, 1042 (N.D. Ill. 1998) (dismissing the plaintiff's FCBA claim in part because the provision of "unsatisfactory service" was not a proper billing error), *aff'd sub nom. Greisz v. Household Bank (Illinois), N.A.*, 176 F.3d 1012 (7th Cir. 1999); *Binder v. Bank of Am. Corp.*, 2010 WL 5017314, at *3 (N.D. Tex. Nov. 22, 2010) ("[M]isrepresentations concerning the 'characteristics' of a travel club membership . . . are more properly construed as misrepresentations regarding the quality of the membership than as a billing error under the FCBA.").

Here, however, Plaintiffs do not allege that Daley's performed shoddy work; instead, they claim to have not received any services at all.  Such non-delivery falls within the statute, *see* 15 U.S.C. § 1666(b)(3) ("billing error" includes "[a] reflection on a statement of . . . services . . . not delivered to the obligor . . . in accordance with the agreement made at the time of a transaction"), the regulation, *see* 12 C.F.R. § 1026.13(a)(3) (same), and the official staff interpretation of these provisions, *see id.* (Supp. I, cmt. for 1026.13) (contemplating "[d]elivery of . . . services different from that agreed upon[,] . . . [d]elivery of the wrong quantity," and "[l]ate delivery").  Other courts have rejected positions similar to Discover's here.  *See Catanach v. Citi Cards/Bank*, 2008 WL 11451608, at *8–9 (D.N.M. Mar. 18, 2008) ("Defendant attempts to limit Plaintiff's dispute as

relating solely to the quality of the goods he received.  The problem with this argument is that it ignores language in the notice that indicates that the dispute also concerns goods that were not delivered. . . .  Delivery of only 21 of the purchased 31 computers would plainly constitute '[d]elivery of the wrong quantity,' which the Official Staff Interpretations list as an example of a billing error.  Additionally, Plaintiff's stated belief in both letters that 'items were missing,' construed liberally in the consumer's favor, as this Court must, falls within the example of '[d]elivery of property . . . different from that agreed upon.'").

Although some courts arguably focus on clerical errors, *see Beaumont*, 2002 WL 483431, at *4 (faulting the plaintiff for "not stat[ing] that he failed to receive a statement, received a statement that contained an error (such as the presence or absence of a particular charge or a miscalculation), or received a statement reflecting a charge about which he requested additional information"), the statute, regulation, and official staff interpretations preclude such a narrow view.  In this vein, Discover argues that Plaintiffs' real dispute is with Daley's, and if the statutory and administrative authorities were limited only to clerical errors by the creditor, Discover might be right.  But this Court cannot simply turn a blind eye to such authorities' repeated reference to *other* kinds of "billing errors," and accordingly, the Court rejects Discover's position.

Alternatively, Discover suggests that the non-delivery of the promised services cannot be a "billing error" because Daley's was not due to complete its work until the end of Fall 2021, yet Plaintiffs submitted their dispute and claimed non-delivery in September 2021.  Combined with Discover's position that the 60-day clock began ticking when Plaintiffs received the initial statement in April 2021, Discover tellingly seeks to place Plaintiffs in an impossible position: They both submitted their complaint too late (*i.e.*, outside the 60-day window) and too early (before completion of the project was due).  This argument only further underscores the absurdity of starting the 60-day clock in April 2021, before Plaintiffs had any reason to believe that Daley's

would not deliver any of the promised services.  Had Plaintiffs submitted a billing dispute within that 60-day window (*i.e.*, in late June 2021), Discover would have told them what they now argue to the Court:  Discover cannot investigate a claim of non-delivery when the delivery deadline has not yet passed.

Nor is Discover's argument compelling even when considered without regard to Discover's position on the 60-day limit.  Although Plaintiffs submitted their billing dispute before the end of Fall 2021, they did so after allegedly being informed by Lehigh County authorities that Daley's had not obtained the necessary permits and was, in fact, the target of a criminal investigation for defrauding clients.  (SAC ¶ 16.)  Nothing in the FCBA's provisions requires an obligor claiming non-delivery to possess absolute certainty; instead, the FCBA merely requires the obligor to state his or her "*belief* that the statement contains a billing error" and "set[] forth the reasons for the obligor's belief."  15 U.S.C. § 1666(a) (emphasis added).  Surely, in some (or even most) cases, an obligor has no reason to believe that goods or services will not be delivered until the delivery deadline passes, but that is not the case here.  And in any event, by December 2021, Daley's indeed had not provided any of the promised services.

## 2.    Plaintiffs Have Pleaded a Claim Under the UTPCPL

Pennsylvania's consumer protection statute, the UTPCPL, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 Pa. Stat. Ann. § 201-3(a).  The UTPCPL's "catch-all" provision defines such unfair or deceptive acts or practices to include "[e]ngaging in any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  *Id.* § 201-2(4)(xxi).  Courts have interpreted this to require plaintiffs to show (1) a deceptive act, (2) justifiable reliance thereon, and (3) ascertainable loss as a result thereof.  *See, e.g.*, *Broadhurst v. CitiMortgage, Inc.*, 838 F. App'x

671, 675 (3d Cir. 2020); *Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 510–11 (E.D. Pa. 2010).

Discover argues that investigating complaints in accordance with the FCBA cannot amount to a deceptive act, and in any event, Plaintiffs have not identified an ascertainable loss flowing therefrom. Plaintiffs claim that the deceptive act derives from Discover's promise, found in the cardmember agreement signed when Plaintiffs opened their account, to investigate billing disputes. Plaintiffs allege further that they would not have paid the $9,000 deposit to Daley's using their Discover card had they known that Discover's investigatory process would only involve confirming that Plaintiffs authorized the transaction—not that Daley's had actually rendered the promised services.

The Court disagrees with Discover's position that investigating a billing dispute pursuant to the law cannot amount to a deceptive act actionable under the UTPCPL. Although there does not appear to be a case on point, numerous cases establish that plaintiffs may pursue insurers under the UTPCPL for "unfair and nonobjective" investigations into their claims, *see, e.g.*, *Fabrikant v. State Farm Fire & Cas. Co.*, 2011 WL 13220763, at *3–4 (M.D. Pa. Apr. 27, 2011) (denying a motion to dismiss the plaintiff's claim that the insurer-defendant's investigation violated the UTPCPL's catch-all provision), and the Court does not find any reason that the consumer-oriented UTPCPL should not also extend to allegedly "sham" investigations in the context of billing disputes.[2] Discovery may show that Discover indeed investigated Plaintiffs' claim in accordance

---

[2]    Based on this case law, which often does not specifically rely on any contractual promises by insurers to investigate claims, it is not even clear that Plaintiffs must point to Discover's representation in the cardmember agreement. The existence of such a provision here, however, amounts to yet another point in favor of declining to dismiss Plaintiffs' UTPCPL claim at this stage.

with what it, in good faith, believed to be its obligations under the cardmember agreement, but the Court cannot make that determination at the present stage of this case. *Cf. Wedemeyer v. U.S. Life Ins. Co. in City of New York*, 2007 WL 710290, at *16 (E.D. Pa. Mar. 6, 2007) (granting summary judgment in favor of a defendant after finding that the plaintiff had not provided evidence of a "sham" investigation).

Likewise, the Court finds that Plaintiffs have pleaded an ascertainable loss arising from the alleged misrepresentation in the cardmember agreement—namely, that they would not have paid the $9,000 deposit with their Discover card had they known that Discover's investigation would not include an assessment of whether services were actually rendered. Accordingly, Discover's motion to dismiss Plaintiffs' UTPCPL claim is denied.[3]

### 3. Negligence

Discover seeks dismissal of Count III, Plaintiffs' negligence claim, on the bases that (1) Discover owed Plaintiffs no duty of care, and Daley's, not Discover, represents the proximate cause of Plaintiffs' injuries, and (2) in any event, the "economic loss" and "gist of the action" doctrines bar Plaintiffs' claim. As a point of clarification, the Court notes that "negligence *per se* is a theory of negligence, not a standalone claim," and merely reflects "the law's acknowledgement that 'through an individual's violation of a statute or ordinance, it is possible to show that the individual breached his duty to behave as a reasonable person,' or negligent." *Clemens v.*

---

[3] Discover suggests that if Plaintiffs' UTPCPL claim arises from the cardmember agreement, which the parties signed in 2013, Discover may have a statute of limitations defense to that claim. (Def.'s Br. Opp. Mot. Dismiss at 10 n.9, ECF No. 18-1.) The parties have not briefed the issue, but it appears that Plaintiffs' claim is timely. UTPCPL claims are subject to a six-year statute of limitations, which "begins to run as soon as the right to institute and maintain a suit arises." *Rodgers v. Lincoln Benefit Life Co.*, 845 F. App'x 145, 147 (3d Cir. 2021) (quoting *Fine v. Checcio*, 582 Pa. 253, 266 (2005)). Plaintiffs did not have the right to bring their UTPCPL claim until Discover concluded its allegedly deficient investigation in November 2021, placing Plaintiffs firmly within the relevant window.

*ExecuPharm, Inc.*, 2023 WL 4139021, at *4 (E.D. Pa. June 22, 2023) (quoting *McCloud v. McLaughlin*, 837 A.2d 541, 545 (Pa. Super. Ct. 2002)).   Accordingly, the Court will consider Count III as Plaintiffs pleaded it:  one negligence claim that Plaintiffs intend to prove through the theory of negligence *per se*, not two distinct negligence claims.

> ### i.   Discover Owed Plaintiffs a Duty and Is a Proximate Cause of Plaintiffs' Alleged Injuries

Pennsylvania courts have defined negligence *per se* as "conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances." *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. Ct. 2014) (quoting *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1058–59 (Pa. Super. Ct. 2003)).   Although the typical negligence claim requires a plaintiff to demonstrate that the defendant breached a duty it owed to the plaintiff, "[t]he concept of negligence *per se* establishes the elements of duty and breach of duty where an individual violates an applicable statute, ordinance, or regulation designed to prevent a public harm." *Id.* at 1073–74.   To prevail on a negligence claim by invoking the theory of negligence *per se*, a plaintiff must establish four elements:

> (1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;
>
> (2) The statute or regulation must clearly apply to the conduct of the defendant;
>
> (3) The defendant must violate the statute or regulation;
>
> (4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries.

*Id.* at 1074.

Discover argues that it owed no duty, fiduciary or otherwise, to Plaintiffs, and that it therefore could not have violated any such duty when it allegedly insufficiently investigated

Plaintiffs' billing dispute. But the above case law makes clear that Discover misses the mark on this objection: Plaintiffs proceed on a theory of negligence *per se*, which serves to "establish[] the elements of duty and breach of duty," so long as Plaintiffs have satisfied the foregoing four elements.

Plaintiffs predicate their negligence *per se* theory on alleged violations of the FCBA and UTPCPL. Discover does not challenge the first three elements as to either statute;[4] instead, it argues that Daley's, not Discover, is the proximate cause of Plaintiffs' injuries. Although Daley's is certainly the proximate cause of the non-delivery of renovations to Plaintiffs' home, Plaintiffs have also alleged that their billing dispute with Discover harmed their credit score and has prevented them from obtaining credit from other providers. As pleaded, had Discover appropriately investigated Plaintiffs' billing dispute and confirmed that the $9,000 charge was a billing error under the FCBA, these injuries would not have occurred. Plaintiffs also argue that they would not have used their Discover card for the $9,000 deposit had they known of the allegedly deficient scope of Discover's investigations into billing disputes. The Court therefore rejects the position that Daley's, not Discover, is the proximate cause of the injuries alleged in the Second Amended Complaint.

### ii. The Economic Loss and Gist of the Action Doctrines Do Not Apply to Plaintiffs' Claim

The economic loss doctrine provides that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pennsylvania*, 604 Pa. 50, 53 n.3 (2009) (quoting

---

[4]     Indeed, at least one other federal court has held that violation of the FCBA may support a theory of negligence *per se*, at least under Alabama law. *See Rigby v. FIA Card Servs., N.A.*, 490 F. App'x 230, 237 (11th Cir. 2012).

*Adams v. Copper Beach Townhome Communities, L.P.*, 816 A.2d 301, 305 (Pa. Super. Ct. 2003)).

It therefore precludes "plaintiffs from recovering in tort economic losses to which their entitlement

flows only from a contract." *Earl v. NVR, Inc.*, 990 F.3d 310, 312 (3d Cir. 2021) (quoting

*Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002)); *see also Duquesne Light Co. v.*

*Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995) (explaining that the reasoning behind

the economic loss doctrine is that "[w]hen loss of the benefit of a bargain is the plaintiff's sole

loss, . . . the undesirable consequences of affording a tort remedy in addition to a contract-based

recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond

that provided by warranty claims" (quoting *King v. Hilton–Davis*, 855 F.2d 1047, 1051 (3d

Cir. 1988))).

      The gist of the action doctrine likewise provides that "an alleged tort claim against a party

to a contract, based on the party's actions undertaken in the course of carrying out a contractual

agreement, is barred when the gist or gravamen of the cause of action stated in the complaint,

although sounding in tort, is, in actuality, a claim against the party for breach of its contractual

obligations." *Earl*, 990 F.3d at 315 (quoting *Dixon v. Nw. Mut.*, 146 A.3d 780, 788 (2016)).  This

Court must consider the following test for whether this doctrine applies here:

> If the facts of a particular claim establish that the duty breached is
> one created by the parties by the terms of their contract—*i.e.*, a
> specific promise to do something that a party would not ordinarily
> have been obligated to do but for the existence of the contract—then
> the claim is to be viewed as one for breach of contract.  If, however,
> the facts establish that the claim involves the defendant's violation
> of a broader social duty owed to all individuals, which is imposed
> by the law of torts and, hence, exists regardless of the contract, then
> it must be regarded as a tort.

*Id.* (quoting *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 112 (2014)).  Where a plaintiff's "complaint is not

primarily premised upon the terms of the contract" and, instead, "the contract is collateral to the

matters alleged," the gist of the action doctrine does not apply.  *Id.* (quoting *Knight v. Springfield Hyundai*, 81 A.3d 940, 951 (Pa. Super. Ct. 2013)).

The cardmember agreement here is collateral to Plaintiffs' claims, and accordingly, the foregoing doctrines do not apply.  The gravamen of the Second Amended Complaint concerns Discover's allegedly deficient investigation into non-delivered services under the FCBA and UTPCPL.  In other words, Plaintiffs' losses do not "flow[] only from a contract," *id.* at 312, but rather from those statutes, which impose duties on Discover "regardless of the contract," *id.* at 315; *cf. Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 105 (3d Cir. 2001) ("[T]he obligations that [the plaintiff] alleges [the defendant] breached in its fiduciary duty claim were imposed 'as a matter of social policy' rather than 'by mutual consensus.'" (quoting *Redevelopment Auth. of Cambria Cnty. v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. Ct. 1996))).  Indeed, Discover itself characterizes its obligation to investigate billing disputes as deriving from federal law, not any contractual representations to Plaintiffs.  (Def.'s Br. Opp. Mot. Dismiss at 9–10.) Further, Plaintiffs, having declined to assert a claim for breach of contract, do not seek "relief beyond that provided by warranty claims," *Duquesne Light*, 66 F.3d at 618, nor have they otherwise recast a breach of contract as a tort.  The Court therefore rejects these doctrines as bases to dismiss Plaintiffs' negligence claim.

### 4.    Mr. Ramon Royer's Ability to Participate in This Action

### i.    Mr. Ramon Royer Cannot Bring Suit Under the UTPCPL

Discover argues that Mr. Ramon Royer lacks standing to participate as a party to this suit because he lacks the relationship with Discover required by each claim.  Plaintiffs argue, in response, that Pennsylvania courts interpreting the UTPCPL have not required "strict technical privity" but rather provide standing to "those specifically intended to rely upon the fraudulent conduct[] and those whose reasonable reliance was specially foreseeable."  *Valley Forge Towers*

*S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 647 (Pa. Super. Ct. 1990), *aff'd*, 529 Pa. 512 (1992).

As the *Valley Forge* language indicates, even if the UTPCPL does not require "strict technical privity," it conversely does not authorize *anyone* to invoke its protections.  Instead, the UTPCPL authorizes private actions only by a "person who purchases or leases goods . . . ."  73 Pa. Stat. Ann. § 201-9.2(a).  The Third Circuit, interpreting this language, held that "[a]lthough direct privity is not required, the statute 'unambiguously permits only persons who have purchased or leased goods or services to sue. . . .  Had the Pennsylvania legislature wanted to create a cause of action for those not involved in a sale or lease, it would have done so.'"  *Branche v. Wells Fargo Home Mortg., Inc.*, 624 F. App'x 61, 64 (3d Cir. 2015) (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992)).  Accordingly, even a person "who may receive a benefit from the purchase" is not a "purchaser" under the UTPCPL.  *Id.*  Applying those conclusions to the case before it, the *Branche* court held that where a plaintiff's husband had obtained a mortgage, and where, after his death, only his estate was listed on the mortgage, the plaintiff-spouse could not bring a UTPCPL claim in her own name.  *Id.*

The Third Circuit's decision in *Branche* compels this Court to find that Mr. Ramon Royer cannot assert a UTPCPL claim against Discover.  *See also, e.g.*, *Needle v. T. Rowe Price Grp. Inc.*, 2022 WL 3592206, at *7 (E.D. Pa. Aug. 19, 2022) (plaintiffs who "received the benefit of [their mother's] contributions to the IRA . . . are neither purchasers nor lessors under the Third Circuit's definitions.").  Plaintiffs point to certain cases that postdate *Branche* and reiterate that a UTPCPL claim is available to those whose "reliance on alleged misrepresentations was specially foreseeable."  *Adams v. Hellings Builders, Inc.*, 146 A.3d 795, 801 (Pa. Super. Ct. 2016).  Such cases, however, rely on precedent (such as *Valley Forge*) that was available to the Third Circuit when it issued *Branche* (and even *Katz*).  In any event, it is not clear that such precedent supports

the position that Mr. Royer's reliance on Discover's promise to investigate billing disputes was "specially foreseeable." The *Valley Forge* court predicated its rejection of "strict technical privity" on the possibility that potential defendants could "successfully evade liability" by "supplying their product and their warranties" to consumers through an intermediary, leaving only the intermediary "to pay the judgment when the deception is discovered later." *Valley Forge Towers S. Condo.*, 574 A.2d at 646–67.  Similarly, the *Adams* court discussed a line of cases preserving liability for malfeasant contractors when home ownership is transferred from one innocent party to another and only that latter innocent party discovers the latent defect in the home. *Adams*, 146 A.3d at 799–800 (citing *Woodward v. Dietrich*, 548 A.2d 301, 303, 311–12, 316 (Pa. Super. Ct. 1988)).

This case does not present the problem of Discover escaping liability by passing its alleged misrepresentation through an intermediary to Mr. Ramon Royer.  Instead, Mr. Randall Royer and Ms. Goda will be able to pursue that same UTPCPL claim in this suit.  Further, Plaintiffs' position would possibly confer the right to sue under the UTPCPL to *any* person on whose behalf Mr. Randall Royer and Ms. Goda made a purchase with their Discover card.  That seemingly unlimited class of persons could not have been "specially foreseeable" to Discover when it extended credit only to Mr. Randall Royer and Ms. Goda.  For those reasons, the Court finds that Mr. Ramon Royer cannot sue Discover under the UTPCPL.

### ii.    At This Stage of the Proceedings, Mr. Ramon Royer Has Standing to Sue Discover for Negligence

Mr. Ramon Royer's inability to sue in his own name under the UTPCPL, however, does not foreclose his ability to participate in this suit.  Plaintiffs advance a separate argument that notwithstanding the foregoing analysis, Mr. Royer nonetheless has standing to pursue Plaintiffs' theory that Discover committed negligence *per se* when it allegedly violated the UTPCPL.  In sum, Plaintiffs creatively theorize that (1) the UTPCPL provides relief to a broader class of persons in

actions brought by *public* officials, not private citizens, and (2) Plaintiffs may make use of that public right of action for their negligence *per se* theory.

Discover has not addressed these points. As to the first, in cases brought by the Pennsylvania Attorney General or a District Attorney, the UTPCPL permits courts to "restore to *any person in interest* any moneys or property, real or personal, which may have been acquired by means of any violation of this act . . . ." 73 Pa. Stat. Ann. § 201-4.1 (emphasis added). The Pennsylvania Supreme Court has interpreted the term "any person in interest" broadly and found that it covers not just the private entities defined as "persons" elsewhere in the UTPCPL, but also public entities such as the Pennsylvania Office of the Attorney General:

> Proper construction of section 4.1 requires consideration of the phrase "person in interest" as a whole. As stated hereinabove, the goal of all statutory interpretation is to "ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). The best indicator of the General Assembly's intent is the plain language of the statute. The phrase at issue here encapsulates those whose interests were affected by the enjoined conduct, *i.e.*, those who lost money or property because of the enjoinable conduct that was found to violate the UTPCPL. This expansive definition, which is broader than the statutorily-defined term "person," furthers the long-recognized directive that the UTPCPL be construed liberally to achieve its objective of preventing fraud or unfair or deceptive business practices and leveling the playing field between businesses and consumers.

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 643 (2018) (citation omitted). Put succinctly, the Pennsylvania Supreme Court held that "[i]f the General Assembly intended to restrict eligibility for a remedy under section 4.1 to those encompassed by 'person' as defined in section 2(2), it could have employed that term. Instead, it defined the class of eligible recipients as any 'person in interest.'" *Id.* Likewise, a court in this District recently held that in a public action, the UTPCPL covers a defendant's transactions with not just individual consumers but also businesses. *Fed. Trade Comm'n v. Am. Future Sys., Inc.*, 2021 WL 1721589,

at *12 (E.D. Pa. Apr. 30, 2021).  In so holding, the court expressly rejected incorporating into a public action the UTPCPL's restriction of private actions to only a "person who purchases or leases goods."  *Id.* ("The text of § 201-4 does not contain any limitation on the target of a person's unfair or deceptive business practices.").

Although not exactly on point, these cases suggest that this Court should interpret the term "person in interest" broadly and should not equate it with only those persons eligible to bring a private action—*i.e.*, a "person who purchases or leases goods."  Accordingly, although Mr. Ramon Royer is not a purchaser or lessee of goods, the Court finds that as a person "whose interests were affected" by Discover's alleged conduct, *see Golden Gate Nat'l Senior Care*, 648 Pa. at 643, he falls within the broad class of "person[s] in interest."

Having established that Mr. Ramon Royer is a "person in interest" for whom a public official could obtain certain statutory remedies, the Court turns to the second point of Plaintiffs' theory:  whether Plaintiffs can appropriate those public action provisions for their negligence *per se* argument.  Some courts in this District have acknowledged that "[a] statute may still be used as the basis for a negligence *per se* claim when it is clear that, despite the absence of a private right of action, the policy of the statute will be furthered by such a claim because its purpose is to protect a particular group of individuals."  *Sharp v. Artifex, Ltd.*, 110 F. Supp. 2d 388, 392 (W.D. Pa. 1999) (citing *Fallowfield Dev. Corp. v. Strunk*, 1990 WL 52745, at *19 (E.D. Pa. Apr. 23, 1990)); *see also Swanson v. McNeil, PPC, Inc.*, 1996 WL 182806, at *4 n.10 (E.D. Pa. Apr. 17, 1996) (gathering cases).  Other sibling courts within this Circuit disagree.  *See, e.g.*, *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 12 F. Supp. 2d 391, 412–14 (M.D. Pa. 1998) (citing *Lutz v. Chromatex, Inc.*, 718 F. Supp. 413, 428 (M.D. Pa. 1989)).  Even *Andritz Sprout-Bauer*, however, ultimately supports Plaintiffs' position, as that court noted that nowhere in the statute before it did the Pennsylvania General Assembly provide for private recovery, suggesting that predicating a

negligence *per se* claim on that statute would contravene legislative intent.   *Id.* at 413–14

(discussing *Lutz*, 718 F. Supp. at 428).  But the *Andritz Sprout-Bauer* court contrasted the statute

before it with those statutes that *do* indeed authorize private actions, because permitting plaintiffs

to pursue theories of negligence *per se* for that latter class of statutes would comport with

legislative intent.  *Id.* at 414 (discussing *Centolanza v. Lehigh Valley Dairies, Inc.*, 635 A.2d 143,

150 (Pa. Super. Ct. 1993), *aff'd*, 540 Pa. 398 (1995)).

Here, the Pennsylvania General Assembly provided for a private right of action in the

UTPCPL with the aim of reducing deception in the consumer market.  Accordingly, predicating a

negligence *per se* claim on the UTPCPL would not contravene legislative intent.  Considering the

limited briefing from the parties on this issue and the early stage of this litigation, the Court finds

that Mr. Ramon Royer shall remain party to the litigation in pursuit of Plaintiffs' negligence claim.

### B.    Plaintiffs' Request for a TRO

Plaintiffs request an order from this Court "requiring the Defendant to charge back the

disputed amount in this case and report to any credit reporting agencies that derogatory information

concerning the disputed account should be deleted."  (Pls.' TRO Mot. at 1.)  "A party seeking a

preliminary injunction must show:  (1) a likelihood of success on the merits; (2) that it will suffer

irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in

even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Kos*

*Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v.*

*DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)).  Such relief "is 'an extraordinary remedy' and

'should be granted only in limited circumstances.'"  *Id.* (quoting *American Tel. & Tel. Co. v.*

*Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).

Courts also distinguish between prohibitory injunctions, which merely "maintain[] 'the

status quo until a decision on the merits of a case is rendered," and mandatory injunctions, which

"alter the status quo by commanding some positive action or provid[ing] the moving party with substantially all the relief sought . . . ." *C.G. by & through P.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 438 (E.D. Pa. 2021) (first quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994), and then quoting *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. 2020) (cleaned up)).   For mandatory injunctions, which Plaintiffs seek here, a heightened burden applies:  Plaintiffs must show "a substantial likelihood of success on the merits and that their right to relief is indisputably clear." *Id.* (quoting *Dunmore Sch. Dist. v. Pennsylvania Interscholastic Athletic Ass'n*, 505 F. Supp. 3d 447, 457 (M.D. Pa. 2020)).

This Court finds that Plaintiffs have not met this demanding burden, particularly as to the requisite showing of irreparable harm.  Much of the alleged harm is compensable by damages should Plaintiffs prevail in this action. *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977) ("[T]he injury must be of a peculiar nature, so that compensation in money cannot atone for it." (quoting *Gause v. Perkins*, 56 N.C. 177, 179 (1857))).  The $9,000 down payment is a patently an injury that Discover can remedy through damages.  It also far from clear that the reduction in Plaintiffs' credit score is irreparable; if Plaintiffs obtain the relief requested in the Second Amended Complaint, then Discover will be ordered to remove the delinquent notice appearing on Plaintiffs' records. *See, e.g.*, *Evans v. City of Ann Arbor*, 2021 WL 1405171, at *2 (E.D. Mich. Apr. 14, 2021) ("Plaintiffs do not explain how having a lower credit score will result in immediate and irreparable harm to Plaintiff Evans," and the "[e]conomic damages" flowing therefrom "are generally insufficient to support emergency injunctive relief."). *But see Montoya v. CRST Expedited, Inc.*, 2020 WL 2850235, at *1 (D. Mass. June 2, 2020) (granting a preliminary injunction in part because the plaintiffs' "tuition debt has negatively affected their credit scores and ability to secure loans").

Further, the Court is not insensitive to the difficulties imposed on Mr. Ramon Royer in having to frequently use the stairs, but Plaintiffs have not established that they cannot alter their living arrangements to provide easier access for Mr. Royer to the rest of their house.  Plaintiffs certainly endure a burden in making such an adjustment, but the extraordinary nature of injunctive relief, especially *mandatory* injunctions, has led the Third Circuit to explain that "[t]here are many rearrangements—not just scrimping and saving rearrangements—that individuals involved in a legal battle must endure pending the conclusion of a suit, and very few will be without some anguish.  As we have stated, 'injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.'"  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 490 (3d Cir. 2000) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992)).

A final legal principle counsels rejection of Plaintiffs' request.  Plaintiffs effectively ask the Court to grant them the very same relief that they would obtain if they prevailed in this case.  But the Third Circuit has favorably cited a Ninth Circuit case for the proposition that "in a TRO proceeding, 'it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial . . . [t]his is particularly true where the relief afforded, rather than preserving the status quo, completely changes it.'"  *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160–61 (3d Cir. 2020) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808–09 (9th Cir. 1963)).  For these reasons, the Court denies Plaintiffs' request.

### C.    Plaintiffs' Motion for Sanctions

Plaintiffs allegedly submitted their complaint to Discover through a billing dispute page on Discover's website.  The parties exchanged further communications through this messaging platform as Discover reviewed the billing dispute and concluded its investigation.  Plaintiffs claim that after initiating this lawsuit, Discover removed these messages and their associated documents,

apparently such that Plaintiffs no longer have access to them.  Based on Discover's assertion that it "has not been able to locate any written dispute in September 2021" (Def.'s Br. Opp. Mot. Dismiss at 6 n.3), and after reaching out to Discover and receiving no response, Plaintiffs moved this Court for sanctions.

Discover has clarified that its statement pertained to a written dispute delivered via mail, not via its website.  It is therefore not clear that any improper destruction of records has occurred. Further, the parties have not yet completed discovery in this case.  Plaintiffs' request for sanctions is therefore premature, and the Court denies it without prejudice.

## IV.   CONCLUSION

For the foregoing reasons, Discover's Motion to Dismiss is granted in part and denied in part, Plaintiffs' Motion for Temporary Restraining Order is denied, and Plaintiffs' Motion for Sanctions is denied without prejudice.  A corresponding order accompanies this memorandum.